Receipt Number

5 4 2 9 8 7 _ _ .

49

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE L. VERMEYLEN, on Behalf of Herself and
a Class of Persons Similarly Situated,

    Plaintiff,

v.

PROQUEST COMPANY, ALAN W. ALDWORTH,
KEVIN G. GREGORY, TODD W. BUCHARDT,
RANDY BEST, DAVID G. BROWN, MICHAEL
GELTZEILER, TODD NELSON, WILLIAM E.
OBERNDORF, LINDA G. ROBERTS, JAMES P.
ROEMER, GARY L. ROUBOS, FREDERICK J.
SCHWAB, DAVID BONDERMAN, WILLIAM J.
WHITE, JOHN H. SCULLY and DOES 1 through 50,

    Defendants.

Case: 2:06-cv-12327
Assigned To: Hood, Denise Page
Referral Judge: Majzoub, Mona K
Filed: 05-23-2006 At 12:05 PM
CMP VERMEYLEN V. PROQUEST CO. ET AL
(TAM)

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF ERISA

Plaintiff Nicole L. Vermeylen, on behalf of the ProQuest Profit Sharing Retirement Plan (the

"Plan"), and on behalf of herself and a Class of all others similarly situated, alleges the following on

personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other

facts:

### I.

### NATURE OF THE ACTION

1. Plaintiff brings this action for plan-wide relief on behalf of the Plan and as a class

action on behalf of a class of all participants in the Plan for whose individual accounts the Plan

purchased or held ProQuest Company ("ProQuest" or the "Company") securities from February 13,

2003 through and the present (the "Class" and the "Class Period", respectively).

2.      At all relevant times, Plaintiff was a ProQuest employee and was a participant in, and beneficiary of, the Plan.  As a participant in the Plan, Plaintiff was entitled to set aside a certain percentage of her annual base salary and invest those funds through the Plan.  ProQuest matched each participant's contribution with ProQuest stock and encouraged Plan participants to purchase and hold as much of the ProQuest stock as possible.

3.      During the Class Period, based in part on positive statements by ProQuest and the Individual Defendants, participants allocated significant amounts of their individual contributions to ProQuest stock and maintained their assets in that stock.

4.  As more fully set forth below, Defendants were fiduciaries who, rather than acting prudently and solely in the interest of the Plan and its Participants and beneficiaries, failed to protect the Plan from huge losses -- even though they should have known that investing in ProQuest stock was an imprudent investment for the Plan.

5.  Plaintiff brings the action pursuant to Section 502 of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. § 1132, against fiduciaries of the Plan who are and were responsible for the investment of its assets and its administration.

6.      Defendants breached their fiduciary duties by:

(a)      offering ProQuest common stock as a Plan investment option and permitting the Plan to buy and hold ProQuest shares when those shares were imprudent investments;

(b)      negligently misrepresenting and negligently failing to disclose information necessary for participants to manage Plan assets and make informed decisions concerning the investment of their individual Plan accounts; and

(c)      failing to monitor the activities of other fiduciaries.

2

7.      Defendants also breached their fiduciary duties to Plan participants by issuing a series of materially false and misleading public statements about ProQuest's businesses, as well as its financial prospects and results, causing ProQuest stock to trade at artificially inflated levels during the Class Period and causing the stock price to fall when the market began to learn the truth about ProQuest's problems.

8.      Throughout the Class Period, Defendants failed to disclose material facts about ProQuest's business operations, including the Company's failure to properly defer income and royalty payments and its improper capitalization of royalty expenses, thereby overstating its revenue and income during the Class Period. As a result, Defendants failed to disclose a material risk to ProQuest's business.

9.      Only after Defendant Roemer completed sales of over 65,000 shares for proceeds of approximately $1.8 million did ProQuest issue a press release on February 9, 2006, disclosing some of the problems that ProQuest was experiencing, including that the Company had discovered material irregularities in its accounting, the effect of which would materially reduce its earnings from what had previously been reported.

10.      In response, ProQuest's stock price plummeted to trade as low as $21.90 per share before closing at $24.19 per share, a price that is significantly less than the prices at which ProQuest's common stock traded during the Class Period. ProQuest stock prices continued to drop and even traded as low as $11 on May 17, 2006.

11.      Since the Plan's holdings in ProQuest stock comprised a significant percentage of the overall value of the assets the Plan held on behalf of its beneficiaries, the long-term retirement savings of Plaintiff and members of the Class were dependent, to a substantial degree, on the performance of ProQuest common stock. So too were their retirement fortunes dependent on the

3

related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of Plan assets.

12.     As a result of Defendants' breaches of their fiduciary duties, the Plan, Plaintiff and members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from the Plan. As such, under ERISA, Defendants are obligated to restore to the Plan the losses that resulted from their breaches of their fiduciary duties.

## II.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and some Defendants reside or maintain their primary place of business in this district.

## III.

### THE PARTIES

15.     At relevant times, Plaintiff Nicole L. Vermeylen was an employee of ProQuest who participated in the Plan pursuant to ERISA § 3(7), 29 U.S.C. § 1102(7) and invested in ProQuest stock for her retirement account.

16.     Defendant ProQuest is a Delaware corporation with its principal executive offices located at 300 North Zeeb Road, Ann Arbor, Michigan. During the Class Period, ProQuest had more than 28 million shares of common stock outstanding that were traded on the New York Stock Exchange.

4

17.     At all relevant times, ProQuest was the Plan sponsor and administrator and exercised discretionary authority over the Plan, acting through its Board of Directors and officers, including the Individual Defendants and ProQuest's Retirement Board, to manage and administer the Plan.

18.     During the Class Period, ProQuest had effective control over the activities of its officers and employees, including their Plan-related activities and ProQuest had the authority and discretion to hire and to terminate its officers and employees who were responsible for administering the Plan.

19.     ProQuest also had the authority and discretion to appoint, monitor, and remove officers and employees from the Plan's individual fiduciary roles.

20.     At all relevant times, Defendant Alan W. Aldworth ("Aldworth") was and is ProQuest's Chief Executive Officer and President. Aldworth has been Chairman of the Board of Directors since May 2004 and is a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that he exercises discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

21.     Defendant Kevin G. Gregory ("Gregory") is and was at all relevant times the Company's Chief Financial Officer. Defendant Gregory is a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan; and (ii) managing and disposing of the Plan's assets.

22.     Defendant Todd W. Buchardt ("Burchardt") was Senior Vice President and General Counsel for ProQuest Company during the Class Period. As the Company's legal counsel, Defendant Buchardt was privy to the Company's legal affairs, including the Company's legal troubles giving rise to the multi-year restatement. Defendant Buchardt is a fiduciary of the Plan

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

23.     Defendant Randy Best ("Best") has been a Director of the Company since March 2005. Defendant Best is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

24.     Defendant David G. Brown ("Brown") has been a Director of the Company since January 1994. Defendant Brown is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

25.     Defendant Michael Geltzeiler ("Geltzeiler") has been a Director of the Company since September 2004 and serves on the Audit Committee. Defendant Geltzeiler is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

26.     Defendant Todd Nelson ("Nelson") has been a Director of the Company since January 2004. Defendant Nelson is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

27.     Defendant William E. Oberndorf ("Oberndorf") has been a Director of the Company since July 2004. Defendant Oberndorf is a fiduciary of the Plan within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

28.    Defendant Linda G. Roberts ("Roberts") has been a Director of the Company since January 2004. Defendant Roberts is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that she exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

29.    Defendant James P. Roemer ("Roemer") was Chairman of the Board from January 1998 through May 2004 and has been a Director of the Company since February 1995. From January 2002 to January 2003, Mr. Roemer also served as the Company's Chief Executive Officer. From February 1997 to January 2003, he served as President and Chief Executive Officer of the Company. Defendant Roemer is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets. During the Class Period, while in possession of material adverse information about ProQuest's business, Defendant Roemer sold 65,561 shares of ProQuest stock for proceeds of approximately $1.8 million.

30.    Defendant Gary L. Roubos ("Roubos") has been a Director of the Company since February 1994. Defendant Roubos is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

31.    Defendant Frederick J. Schwab ("Schwab") has been a Director of the Company since September 1994. Defendant Schwab is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

32.     Defendant David Bonderman ("Bonderman") was a Director of the Company during the Class Period. Defendant Bonderman is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

33.     Defendant William J. White ("White") was a Director of the Company during the Class Period. Defendant White is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

34.     Defendant John H. Scully ("Scully") was a Director of the Company during the Class Period. Defendant Scully is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21) in that he exercised discretionary authority or control with respect to: (i) managing and administering the Plan and (ii) managing and disposing of the Plan's assets.

35.     Defendants Aldworth, Gregory, Buchardt, Best, Brown, Geltzeiler, Nelson, Oberndorf, Roberts, Roemer, Roubos, Schwab, Bonderman, White and Scully are referred in this Complaint as the "Individual Defendants".

36.     Upon information and belief, the Individual Defendants were senior ProQuest employees or Directors who knew or should have known all material public and non-public information concerning ProQuest's business and operations that were relevant to the appropriateness of ProQuest's common stock as a Plan investment.

37.     Plaintiff is unaware of the true names and capacities of the remaining Defendants sued in this action by the fictitious names DOES 1 through 50. Plaintiff will amend this Complaint when Plaintiff learns the names and capacities of those Defendants. Plaintiff is informed and

believes that each of the fictitiously named Defendants is in some manner responsible for the events that have damaged plaintiff, the Plan and the Class.

IV.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of himself and all other similarly situated participants in or beneficiaries of the Plan during the Class Period from February 13, 2003 through the present. The Class excludes Defendants as well as members of their immediate families, and Defendants' heirs, successors and assigns.

39.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, several hundred members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants each owed a fiduciary duty to Plaintiff and the Class;

(b)     Whether Defendants breached their fiduciary duties to Plaintiff and the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     Whether Defendants violated ERISA; and

(d)     Whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure of those damages.

9

41.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the Class members each sustained damages arising from Defendants' wrongful conduct in violation of ERISA.

42.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and complex litigation under federal law. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.     Class action status in this ERISA action is warranted under Fed.R.Civ.P. 23(b)(1)(B) because prosecution of separate actions by individual members of the Class would create the risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

44.     Class action status is also warranted under the other subsections of Fed.R.Civ.P. 23(b) because:

(a)     Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)     Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

45.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.

10

Furthermore, because the injury suffered by the Individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.     There are one or more putative or certified securities class action cases pending in this District against ProQuest and certain other Defendants. The claims in this action are brought pursuant to ERISA and related principles of federal common law and are not being asserted by the plaintiffs in those other class actions. The named plaintiffs in those class actions do not adequately represent Plaintiff or the Class in this action with respect to ERISA claim, and may be subject to defenses, stays of discovery, heightened pleading requirements and limitations of liability under the Private Securities Litigation Reform Act, 15 U.S.C. § 77z-1(b), and other statutes and rules that do not apply to the claims asserted in this Complaint. Furthermore, the shareholder plaintiffs in the securities actions lack standing under § 502(a) of ERISA, 29 U.S.C. § 1132(a), to bring an action on behalf of the Participants of the Plan for Defendants' fiduciary breaches.

## V.

## **THE PLAN**

47.     The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A). The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant. Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its participants.

48.     The Plan is a "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts

for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

49.     All full-time and certain part-time employees of ProQuest are eligible to participate in the Plan from their date-of-hire.

50.     ProQuest employees may contribute into the Plan from one-percent to fifty percent of their qualified compensation. In 2004, ProQuest contributed between one and eight percent based on years of credited service and the level of employee contributions to each participant based on his/her annual compensation.

51.     The matching contributions are made in cash, which is then used to purchase shares of ProQuest common stock in the open market. In 2004, the Plan invested $2 million to purchase ProQuest common stock. In 2003, the Plan invested $3.34 million to purchase ProQuest common stock and in 2002 it invested $3.32 million to purchase ProQuest common stock for the Plan and its participants.

52.     Each participant's account is credited with the participant's contribution and receives an allocation of the Company's contribution, the Plan's earnings, and an allocation of administrative expenses.

## VI.

## DEFENDANTS' FIDUCIARY STATUS

53.     ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the

exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

## A.    The Duty Of Loyalty

54.    ERISA imposes on a plan fiduciary the duty of loyalty -- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

## B.    The Duty Of Prudence

55.    Section 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence - that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . "

## C.    The Duty To Inform

56.    The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (1) a duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows

13

or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

57.     Pursuant to the duty to inform, at all relevant times, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the Plan's Administrator to furnish a Summary Plan Description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and the investment and management of Plan assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations . . . .

29 C.F.R. § 2520.102-2(b).

**D.     The Duty To Investigate And Monitor Investment Alternatives**

58.     With respect to pension plans such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of

the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

### E. The Duty To Monitor Appointed Fiduciaries

59.     Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. The monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a)     possess the needed credentials and experience or use qualified advisors and service providers to fulfill their duties;

(b)     are provided with adequate financial resources to do their job;

(c)     have adequate information to do their job of overseeing the Plan investments with respect to company stock;

(d)     have access to outside, impartial advisors when needed;

(e)     maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

(f)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

### F. The Duty To Disregard Plan Documents

60.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## DEFENDANTS WERE FIDUCIARIES OF THE PLAN

61.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1). Under ERISA, a person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Additionally, to the extent that a person is delegated responsibilities under the Plan or a procedure specified in the Plan, he is a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

62.     A person can also be a de facto fiduciary as a result of his authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A). A person or entity is a fiduciary even if the plan does not name him as such or by its terms assigns fiduciary duties to him where, by his conduct, he engages in fiduciary activities. Thus, those who have discretionary authority over administering or managing the Plan or who exercise authority or control over the Plan's assets are fiduciaries regardless of the labels or duties that the Plan's language assigns to them.

### A.     ProQuest And Its Board Of Directors Are Fiduciaries Of The Plan

63.     As set forth on the Plan Forms 5500 filed with Department of Labor ("DOL") and the Internal Revenue Service ("IRS"), ProQuest is and was the Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1022(16)(A).

64.     ProQuest was also a fiduciary because it was responsible for disseminating to Participants the Summary Plan Descriptions.

65.     ProQuest was also a fiduciary because it was responsible for disseminating to Participants the Plan prospectus (individually and collectively, "Prospectus") that purported to describe the investment characteristics of Plan investment options. The Prospectus and all

16

information contained or incorporated in it constitutes a representation disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and investment and management of Plan assets allocated to their accounts.

66.     The Prospectus for the Plan also incorporated by reference ProQuest's SEC filings.

67.     ProQuest's SEC filings were part of the SPD and the Prospectus. ProQuest exercised discretion over the contents of the SPD and the Prospectus it disseminated which were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under the Plans.

68.     ProQuest was not required to cause the Plan to offer ProQuest stock as an investment option under the Plan or to incorporate all of ProQuest's SEC filings into the Plan's documents, but once it elected to do so, it made the disclosures in those documents in a fiduciary capacity.

69.     ProQuest was also a fiduciary during the Class Period because its Board of Directors was a fiduciary during that time, as alleged below, and the Board is, by definition, an agent of the corporation.

70.     ProQuest was also a fiduciary because it made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of ProQuest, and the merits of investing Plan assets in ProQuest stock and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement benefits under the Plan.

### The Individual Defendants Were Fiduciaries Of The Plan

71.     The Individual Defendants were Plan fiduciaries because the Board of Directors was, at all relevant times, responsible for appointing members to committees that were authorized to administer the Plan. The Board had the authority to remove any committee member, with or without

17

cause. In connection with these responsibilities, the Directors of ProQuest had a duty to appoint persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties and to evaluate the merits of the Plan's investment options.

72.     The Directors had an ongoing duty to ensure that the persons appointed were performing these duties with respect to the selection of investment options and the investment of Plan assets.

73.     Finally, the Directors had a duty to convey information necessary for the appointees to perform their duties.

74.     As a consequence of these duties owed by ProQuest's Board of Directors, the Board and its members were fiduciaries to the Plan.

### All Of The Defendants Were Co-Fiduciaries

75.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## VII.

## SUBSTANTIVE ALLEGATIONS

### Background

76.     ProQuest purports to be a leading publisher of information solutions for the education, automotive and power markets. ProQuest converts information to microfilm and electronic form and adds value to the information through professionally-prepared proprietary abstracts and indices. The Company's information vault covers all major areas of study including business, humanities, social science, math and science, medical/health, ethnic and diversity studies, genealogy, psychology, biology and current events. The content is primarily in English, but it also has content in 40 other languages including German, Latin, Portuguese, Italian, French and Spanish.

The Company provides products and services to its customers through two business segments -- ProQuest Information and Learning; and ProQuest Business Solutions.

**Materially False And Misleading**
**Statements Issued During The Class Period**

77.    Throughout the Class Period, ProQuest and the Individual Defendants repeatedly issued materially false and misleading statements that omitted to disclose or misrepresented the strength of ProQuest's business and failed to disclose the material problems that ProQuest was having with its business, particularly its failure to properly defer income and royalty payments and its improper capitalization of royalty expenses.  Instead, Defendants repeatedly portrayed the Company as delivering strong earnings and cash flow and on a path of continuing growth.

78.    At the same time that Defendants were creating demand for ProQuest's stock and positively portraying ProQuest's business, defendant Roemer was selling millions of dollars of his own ProQuest stock for his own benefit.

79.    The Class Period begins on February 13, 2003, when Defendants caused ProQuest to issue the first of a series of press releases that positively, but falsely portrayed ProQuest's business. In that press release, the Company reported that earnings for the year ended December 28, 2002 increased 7% and it raised earnings expectations for the full-year 2003 stating that "[t]his growth is evidence of the strength of our business model."

80.    The press release quoted Defendant Aldworth's comments on the quarter:

> In 2002, we strengthened our balance sheet, lowered expenses, and increased our financial flexibility.  We grew revenue, increased content holdings, and signed and renewed long-term contracts with major automotive manufacturer.  This growth is evidence of the strength of our business model, even in this difficult economic climate.  We expect this growth to continue in 2003.

81.     On March 27, 2003, Defendants caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 28, 2002. That document confirmed and repeated the financial information that Defendants announced in their February 13, 2003 press release about the Company's financial results, which eventually would have to be restated.

82.     Defendants Aldworth and Gregory signed the Form 10-K and certified that the statements in ProQuest's 2002 Form 10-K were true and complied with the Sarbanes-Oxley Act of 2002. Defendants represented that "our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America."

83.     The Company and the Individual Defendants then continued to issue press releases and other public statements that falsely portrayed the Company's prospects and omitted to disclose material information about problems that the Company was facing.

84.     On April 22, 2003, the Company issued a press release entitled "ProQuest Reports 35 Percent Net Earnings Growth and Continued Strong Cash Flow for the First Quarter of 2003." The press release stated in part:

> First Quarter 2003 Highlights. . . Revenues were up 9 percent to $111.8 million, compared with $102.8 million in the first quarter of 2002 . . . New earnings for the quarter increased 35 percent to $11.2 million, or $0.40 per fully diluted share, compared with net earnings of $8.3 million or $0.34 per fully diluted share one year ago . . .
>
> "ProQuest generated strong operating cash flow in the first quarter as a result of our 35 percent net earnings growth. This cash flow improvement includes a refund of tax and accrued interest of approximately $13.0 million from the IRS, strong collections of accounts receivable, and the positive impact from the timing of payments on accrued expenses," said Kevin Gregory, ProQuest's senior vice president and chief financial officer.

85. On May 13, 2003, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended March 29, 2003. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on April 22, 2003 as described above.

86. On July 22, 2003, ProQuest issued a press release announcing its second quarter 2003 financial results entitled "ProQuest Reports Revenue Growth of 6 Percent and Earnings Per Share of $0.43 for the Second Quarter 2003." The July 22, 2003 press release reported that:

> Second Quarter 2003 Highlights . . . Revenues were $115.1 million, compared with $109.0 million in the second quarter of 2002 . . . Net earnings for the quarter increased 21 percent to $12.3 million or $0.43 per fully diluted share, compared with net earnings of $10.2 million or $0.40 per fully diluted share one year ago.

87. On August 18, 2003, ProQuest filed its quarterly report with the SEC on Form10-Q for the period ended June 28, 2003. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on July 22, 2003 as set forth above.

88. On October 21, 2003, the Company issued a press release entitled "ProQuest Reports Revenue Growth of 10 Percent and Earnings Per Share of $0.41 for the Third Quarter of 2003." The press release stated in part:

> "We've been focused on ProQuest Company's strategic priorities all year, which were to grow revenues, reduce costs, increase free cash flow, make strategic acquisitions, and bring new products to market," said Alan Aldworth, president and chief executive officer of ProQuest Company." Our execution during the third quarter was excellent," Aldworth added.
>
> Third Quarter 2003 Highlights. . .Revenues were $116.7 million, compared with $106.4 million in the third quarter of 2002. . .Net earnings for the quarter were $11.7 million, or $0.41 per fully diluted share, compared with pro forma net earnings of $11.1 million or $0.39 per fully diluted share one year ago. Pro forma net earnings for the third quarter of 2002 exclude a one-time charge of $5.1 million after tax, or $0.18 per share, related to the settlement of interest rate swaps during that quarter.

21

89.     On November 10, 2003, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended September 27, 2003.  The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on October 21, 2003 set forth above.

90.     On February 19, 2004, the Company issued a press release titled "ProQuest Company Reports Growth in Revenue, Earnings And Operating Cash Flow for 2003."  The press release stated in part:

> For the full year 2003, revenue grew to $469.7 million, a 10 percent increase over 2002. Net earnings were $49.8 million, up 13 percent over pro forma 2002. Earnings per share were $1.75 per fully diluted share, up 6 percent over pro forma 2002 earnings of $1.65.  During 2003, the company took a charge of $1.5 million after-tax for an executive's compensation plan based on stock price.  Excluding this charge, pro forma net earnings were up 17 percent to $51.3 million, or $1.80 per fully diluted share.  Cash flow from operations were $119.6 million for the full year, up $49.3 million over 2002.
>
> "*We made excellent progress on many important fronts this year*. We entered content agreements with prestigious publishing partners, introduced new products and product enhancement that were well received by our markets, and signed new and renewed agreements with several of the world's top automotive OEMs. During 2003, we significantly increased our presence in the growing K-12 market with the acquisitions of Bigchalk and SIRS Publishing," said Alan Aldworth, president and chief executive officer of ProQuest Company.
>
> Aldworth continued, "*We believe that the ProQuest business model is capable of generating significant free cash flow.  During 2003, we surpassed the high end of our free cash flow guidance, generating $48.8 million.  I am very pleased with ProQuest's 2003 performance.*"  (Emphasis added).

91.     On March 18, 2004, ProQuest filed its annual report with the SEC on Form 10-K for the year ended January 3, 2004.  The annual report was signed by Defendants Aldworth and Gregory and included the financial results announced on February 19, 2004 set forth above and stated that

"Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the U.S."

92.     On April 20, 2004, the Company issued a press release titled "ProQuest Company Reports Growth in Revenue and Net Earnings for the First Quarter of 2004." The press release stated in part:

> First Quarter Financial Review . . . Revenue increased 4 percent to $116.2 million, compared to $111.8 million for the prior year's first quarter . . . Net earnings increased 3 percent to $11.5 million or $0.40 per fully diluted share, versus net earnings of $11.2 million or $0.40 per fully dilutes share in the first quarter of fiscal 2003. . .
>
> **"The cash flow results for the first quarter are consistent with the company's cash flow outlook for the year. As anticipated, the decrease in cash flow is primarily the result of the first quarter ending five days later than it did in 2003, pulling certain payments into the first quarter of 2004 that were made at the beginning of the second quarter in 2003**," said Kevin Gregory, ProQuest Company's senior vice president and chief financial officer. (Emphasis added).

93.     On May 13, 2004, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended April 3, 2004. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on April 20, 2004 set forth above.

94.     On June 28, 2004, ProQuest filed with the SEC a Form 11-K for the Plan. Defendant Gregory signed the Form 11-K. The Form 11-K contained descriptions of the Plan's operations. As such, the June 28, 2004 Form 11-K was a fiduciary communication.

95.     The Form 11-K was regularly updated by incorporating by reference, inter alia, the periodic financial results of ProQuest and the Plan contained in the Company's SEC filings, which Participants were able to, and were encouraged to, examine in determining Plan investment options. These representations were fiduciary communications.

23

96.     On July 22, 2004, the Company issued a press release titled "ProQuest Company Reports 13 Percent Earnings Growth for the Second Quarter of 2004." The press release stated in part:

> Second Quarter Financial Results . . . Revenue from continuing operations increased 1 percent to $112.2 million, from $110.7 million in the prior year's second quarter ... Earnings from continuing operations increased 13 percent to $12.9 million or $0.45 per fully diluted share, versus earnings from continuing operations of $11.4 million or $0.40 per fully diluted share in the second quarter of fiscal 2003....

97.     On August 12, 2004, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended July 3, 2004. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on July 22, 2004 set forth above.

98.     On October 21, 2004, the Company issued a press release titled "ProQuest Company Reports 11 Percent Earnings Growth for the Third Quarter of 2004; Also Announces Board Approval of up to $40 Million Share Repurchase." The press release stated in part:

> Third Quarter Financial Results . . . Revenue from continuing operations increased to $113.1 million, from $112.3 million in the prior year's third quarter . Earnings from continuing operations increased 11 percent to $12.2 million or $0.42 per fully diluted share, versus earnings from continuing operations of $11.0 million or $0.38 per fully diluted share in the third quarter of fiscal 2003...
>
> "Overall we had mixed results for the quarter. Earnings growth was strong, however, revenue growth during the quarter was less than anticipated," said Kevin Gregory, senior vice president and chief financial officer of ProQuest Company. "

99.     On November 12, 2004, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended October 2, 2004. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on October 21, 2004 set forth above.

100.   On February 24, 2005, the Company issued a press release titled "ProQuest Company Reports 13 Percent Increase in Earnings for 2004; Fourth Quarter Revenue Increased 5 Percent and Earnings Increased 23 Percent." The press release stated in part:

> Fourth Quarter Financial Results.   Revenue from continuing operations increased 5 percent to $126.7 million from $120.5 million in the prior year's fourth quarter.  Earnings from continuing operations increased 23 percent to $16.8 million or $0.58 per fully diluted share versus $13.7 million or $0.48 per fully diluted share in the fourth quarter of fiscal 2003…
>
> Consolidated Full Year 2004 Financial Results … Revenue from continuing operations increased 3 percent to $462.8 million compared to $451.1 million in fiscal 2003.   Earnings from continuing operations increased 13 percent to $52.7 million or $1.83 per fully diluted share versus $46.7 million or $1.64 per fully diluted share in fiscal 2003.

101.   On March 17, 2005, ProQuest filed its annual report with the SEC on Form 10-K for the year ended January 1, 2005. The annual report was signed by Defendants Aldworth and Gregory and included the financial results announced on February 24, 2005 set forth above and stated that "Our Consolidated Financial Statements are prepared in accordance with accounting principles generally accepted in the U.S."

102.   On April 28, 2005, the Company issued a press release titled "ProQuest Company First Quarter Revenue Up 9 Percent." The press release stated in part:

> First Quarter Financial Results . . . Revenue from continuing operations increased 9 percent to $121.1 million from $110.8 million in the prior year's first quarter . . . Earnings from continuing operations decreased 28 percent to $7.8 million or $0.26 per fully diluted share versus $10.9 million or $0.38 per fully diluted share in the first quarter of fiscal 2004.

103.   On May 12, 2005, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended April 2, 2005. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on April 28, 2005 set forth above.

104.    On June 29, 2005, ProQuest filed with the SEC a Form 11-K for the Plan. Defendant

Gregory signed the Form 11-K. The Form 11-K contained descriptions of the Plan's operations. As

such, the June 29, 2005 Form 11-K was a fiduciary communication.

105.    The Form 11-K was regularly updated by incorporating by reference, <u>inter alia</u>, the

periodic financial results of ProQuest and the Plan contained in the Company's SEC filings, which

Participants were able to, and were encouraged to, examine in determining Plan investment options.

These representations were fiduciary communications.

106.    On July 28, 2005, the Company issued a press release titled "ProQuest Company

Reports 25 Percent Revenue Growth for the Second Quarter of 2005." The press release stated in

part:

> Second Quarter Financial Results…Revenue from continuing
> operations increased 25 percent to $140.4 million from $112.2
> million in the prior year's second quarter . . .  Earnings from
> continuing operations were $12.3 million or $0.41 per fully diluted
> share, a decrease of 5 percent. This compares to $12.9 million or
> $0.45 per fully diluted share in the second quarter of fiscal 2004.

107.    On August 10, 2005, ProQuest filed its quarterly report with the SEC on Form 10-Q

for the period ended July 2, 2005. The quarterly report was signed by Defendants Aldworth and

Gregory and included the financial results announced on July 28, 2005 set forth above.

108.    On October 27, 2005, the Company issued a press release titled "ProQuest Reports

Revenue of $159.4 Million, Earnings Per Share of $0.60 for Third Quarter 2005; Announces Intent

to Divest Periodical Microfilm Business and Other Assets." The press release stated in part:

> *"ProQuest Company's revenue and earnings increased in the*
> *third quarter of 2005 despite the previously disclosed impact of*
> *Hurricanes Katrina and Rita and earnings dilution from*
> *acquisitions and investments made at Business Solutions,"* said
> Alan Aldworth, chairman and chief executive officer of ProQuest
> Company.

> Third Quarter Financial Results...Revenue from continuing operations increased 41 percent to $159.4 million from $1111 million in the prior year's third quarter . . . Earnings from continuing operations were $18.2 million or $0.60 per fully diluted share, an increase of 57 percent. This compares to pro forma earnings of $11.6 million or $0.40 per fully diluted share in the third quarter of f fiscal 2004. (Emphasis added).

109.    On November 10, 2005, ProQuest filed its quarterly report with the SEC on Form 10-Q for the period ended October 1, 2005. The quarterly report was signed by Defendants Aldworth and Gregory and included the financial results announced on October 27, 2005 set forth above.

110.    The statements referenced above in ¶¶80-108 were each false and misleading when issued because they misrepresented and failed to disclose the following material adverse facts:

(a)     The Company's financial statements were materially misstated due to its failure to properly defer income and royalty payments and its improper capitalization of royalty expenses, thereby overstating its revenue and income during the Class Period; and

(b)     The Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and therefore were false and misleading.

## THE TRUTH IS REVEALED

111.    On February 9, 2006, prior to the market opening, the Company issued a press release titled "ProQuest Company to Restate Historical Financial Statements." The press release stated in part:

> ProQuest Company, a publisher of information and education solutions, announced that during a review related to its internal controls assessment required by the Sarbanes-Oxley Act of 2002, the company discovered material irregularities in its accounting. As a result, the company intends to restate certain of its previously issued financial statements . . .
>
> Based upon its initial findings, the company believes that its deferred income and accrued royalty accounts are materially understated in previously issued financial statements. It also

believes that its prepaid royalty account is materially overstated. It anticipates that as a result it will be required to recognize amounts of royalty and other expenses as well as reduce a portion of revenues previously reported for its Information and Learning business, the effect of which will materially reduce earnings from continuing operations for many of the affected periods. Based upon its initial findings, the company believes that the accounting irregularities do not affect the company's cash balances, the amounts invoiced to customers, cash receipts from customers, or disbursements to publishers and suppliers.

"While we are disappointed to have discovered these accounting irregularities, the Board and senior management team of ProQuest are absolutely committed to the highest level of accounting and financial reporting standards," said Alan Aldworth, chairman and chief executive officer of ProQuest Company. "Our business units remain focused on providing our customers with quality products and the highest level of customer service."

112.    On this news, ProQuest's stock collapsed to as low as $21.90 per share, before closing at $24.19 per share on volume of 3 million shares, 13 times the average volume.

113.    Since this announcement, the price of ProQuest common stock has continued to drop and as of May 9, 2006, traded as low as $11 per share.

### Defendants Are Liable For All Imprudent Investments

114.    Defendants are liable for imprudent investments made by the Plan, even though the Participants directed their individual contributions to the Plan, because the Plan and the Defendants did not shift liability for imprudent investments by the Plan to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c). Thus, Defendants' liability for losses is the same as the liability of a pension fund manager in a traditionally defined benefit "pension" plan.

115.    Although fiduciaries can shift liability for imprudent investments from themselves to the Participants under § 404(c), Defendants failed to shift liability to Participants for imprudent investment decisions because they failed to comply with Section § 404(c) for various reasons, including:  (i) they failed to adequately declare that the Plan was a 404(c) plan; (ii) Defendants

28

negligently failed to disclose to Participants all material information necessary for Participants to make investment decisions that they were not precluded from disclosing under applicable law; and (iii) Defendants failed to provide an adequate description of the investment objectives and risk and return characteristics of the Plan.

116.    Because Defendants did not comply with § 404(c), Defendants are liable for losses suffered as a result of the Plan's imprudent investments, regardless of whether participants selected the investments made by the Plan for participants' individual accounts.

117.    Further, the act of designating investment alternatives is a fiduciary function regardless of a Plan's purported status as an ERISA § 404(c) status. The responsible Plan fiduciaries are subject to ERISA's general fiduciary standards in initially choosing and/or continuing to designate investment alternatives offered by the Plan.

118.    As ProQuest stock lost a significant amount of its value, the Plan suffered devastating losses. Hundreds or thousands of participants lost a substantial portion of their retirement savings. Defendants are liable for those losses that were caused by their breaches of fiduciary duty.

## COUNT I

### Defendants Breached Their Fiduciary Duties By Designating ProQuest Stock
### As An Investment Option And Permitting The Plan To Invest In ProQuest Stock

119.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

120.    Defendants breached their fiduciary duties by allowing the Plan to purchase and hold ProQuest shares during the Class Period and by allowing the ProQuest shares to remain as investment options under the Plan, because ProQuest stock was an imprudent investment for the Plan whose purpose was to provide for employee retirement income security.

121.    As a result, Defendants should have terminated ProQuest stock as an investment option, halted the purchase of ProQuest shares and sold all their shares in ProQuest stock.

122.    To the contrary, Defendants failed to act in the best interest of the Plan and the Class members.

123.    To the extent that Defendants possessed material adverse nonpublic information, they should have prevented the Plan from purchasing additional ProQuest shares. They also should have directed the Plan to sell all of its ProQuest shares and disclosed this nonpublic information prior to any sales by the Plan. Had they done so, the Plan would have limited its losses substantially, even though the price might have dropped somewhat upon disclosure.

124.    Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have know that the Plan should not have invested such large amounts in ProQuest stock.

125.    Defendants also breached their fiduciary duties in allowing the Trustee to continue to direct the Company Match portion of the Plan to the purchase of ProQuest stock while they should

30

have known that the ProQuest stock price was artificially inflated and, as a result, the Participants received fewer shares than they were entitled to under the terms of the Plan.

126.   As a consequence of Defendants' breaches, the Plan suffered losses.

127.   Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under ERISA § 502(a)(2).

128.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT II

### Failure To Prudently And Loyally Manage the Assets Of The Plans -
### Breaches Of Fiduciary Duties In Violation Of ERISA § 404 – All Defendants

129.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

130.   At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

131.   Defendants were responsible for selecting, maintaining and monitoring the Plan's investment options, including the option to purchase and to hold ProQuest securities.

132.   Defendants exercised discretionary authority and/or control over managing the Plan or disposing of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to participants in the Plan were prudent.   Defendants were responsible for ensuring that all investments in the ProQuest securities in the Plan were prudent and, as a result, Defendants are liable for losses incurred as a result of such investments being imprudent.

133.   In direct violation of their duty of loyalty to the Plan and its members, Defendants failed to diverge from the Plan documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Plaintiff and members of the Class.

Defendants, either themselves or through persons they direct or control, blindly followed Plan documents and directives, leading to an imprudent result that harmed the Plan's participants and beneficiaries.

134.    Defendants breached their duties to prudently and loyally manage the assets of the Plan. During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in the ProQuest securities was imprudent in that any such investment was unsuitable and inappropriate for either participants or Company contributions to the Plan. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer and require the ProQuest securities as an investment requirement for the Plan and to direct and approve Plan investment in the ProQuest securities, instead of other investments. Despite the imprudence of any investment in the ProQuest securities during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in ProQuest securities.

135.    Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiff and members of the Class, regardless of Defendants' own interests.

136.    Defendants also breached their fiduciary duties by failing to disclose that they had failed to prudently and loyally manage the assets of the Plan in the exercise of their discretion with respect to the ProQuest securities.

137.    As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiff and the Class, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

## COUNT III

### Failure To Monitor The Plan And Provide Accurate
### Information -- Breaches Of Fiduciary Duties In Violation Of ERISA § 404

138.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

139.   During the Class Period, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A).

140.   The duty of the fiduciary includes at least:

(a)   a duty not to misinform;

(b)   a duty to inform when the fiduciary knows or should know that silence might be harmful; and

(c)   a duty to convey complete and accurate information material of the circumstances to participants and beneficiaries.

141.   Defendants negligently misrepresented to participants the riskiness of their investments in the ProQuest stock by failing to provide an adequate description of the investment objectives and risk and return characteristics of ProQuest stock. Defendants failed to disclose that the performance and value of the ProQuest stock in participants' accounts were substantially affected by the facts and risks alleged above.

142.   Defendants breached their fiduciary duties in that they negligently made material misrepresentations and negligently failed to disclose material information to participants concerning the Plan's investment options as alleged above.

143.   In breach of their fiduciary duties, Defendants also made negligent misrepresentations and negligently failed to disclose material information to participants.

144.    Defendants should have known that their negligent misstatements and nondisclosures alleged above would artificially inflate the market price of ProQuest securities, and that the price the Plan paid for ProQuest shares would likewise be inflated.   As a result of these negligent misrepresentations and nondisclosures, the Plan's purchases of ProQuest stock were imprudent because the shares cost more than their true value.

145.    Moreover, Defendants should have known that when the market learned the truth about ProQuest's problems, the market price of ProQuest securities – and the value of the Plan – would drop which would further cause the investments in ProQuest stock to be imprudent.

146.    The Plan, and the participants acting on behalf of the Plan, relied upon, and are presumed to have relied upon, Defendants' representations and nondisclosures to their detriment.

147.    As a consequence of Defendants' misrepresentations and nondisclosures, the Plan suffered losses.

148.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

149.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## COUNT IV

### Failure To Monitor The Plan And Provide The Administrators Of The Plan And Other Fiduciaries With Accurate Information – Breaches Of Fiduciary Duties In Violation Of ERISA § 404

150.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

151.    During the Class Period Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

152. By virtue of their fiduciary responsibilities, Defendants also were bound to monitor other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

153. Defendants breached their duties to monitor and inform by:

(a) Failing to ensure that the monitored fiduciaries had access to knowledge about ProQuest's risk associated with its international business, as alleged above, which made the ProQuest securities an imprudent investment;

(b) Failing to ensure that the monitored fiduciaries appreciated the increased risk posed by the significant investment by rank and file employees in the ProQuest securities; and

(c) Failing to disclose to the monitored fiduciaries accurate information about the operations of and risks to ProQuest that Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plan should offer.

154. Defendants are liable as co-fiduciaries because:

(a) They participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities implicated in this Count;

(b) They enabled the breaches by these Defendants; and

(c) They reasonably should have known of these breaches yet made not effort to remedy them.

155. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT V

### Failure To Provide Complete And Accurate
### Information To The Plan's Participants And Beneficiaries --
### Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405

156.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

157.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

158.    During the Class Period Defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete and not misleading, including information concerning the investment options the Plan offered.

159.    Throughout the Class Period, Defendants failed to provide participants in the Plan with complete and accurate information regarding ProQuest's operations and risks that was necessary for participants in the Plan to accurately assess the quality of an investment in ProQuest securities. Defendants conveyed false and misleading material information to the investing public and to Plaintiff and the Class, regarding the soundness of ProQuest securities and the prudence of investing retirement savings in ProQuest securities. Because large percentages of the assets of the Plans were invested in ProQuest securities during the Class Period, losses therefrom materially affected the value of the retirement assets of Plaintiff and the Class.

160.    Defendants' fundamentally deceptive affirmative misrepresentations and omissions were material to Plaintiff's and the other Class members' determinations about investing in or maintaining their investments in the ProQuest securities. As such, Plaintiff and members of the

Class are presumed to have relied to their detriment on Defendants' misleading statements, acts and omissions.

161.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT VI

### Failure To Act Exclusively In The Interests Of Participants In The Plan -- Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405

162.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

163.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

164.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Plaintiff and the members of the Class and for the exclusive purpose of providing benefits to the Plan, Plaintiff and the Class.

165.    Defendants breached their duty of loyalty by:

(a)    Failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investments in ProQuest securities;

(b)    Failing to notify appropriate federal agencies of the facts and transactions which made ProQuest securities an unsuitable investment for the Plan;

(c)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)    With respect to each failure listed above, Defendants failed to adequately inform Plaintiff and members of the Class in order to prevent general investors, creditors and others from discovering ProQuest's risk and financial weaknesses;

(e)    By otherwise placing the interests of ProQuest and themselves above the interests of the participants with respect to the investments of the Plan in the ProQuest securities; and

(f)    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT VII

### Defendants, Other Than The Trustee, Are Liable As Co-Fiduciaries For The Breaches Of Fiduciary Duties By The Other Defendants

166.    Plaintiff repeats and realleges the allegations contained above as if they were set forth in full in this Count.

167.    Any allegation in this Claim that any defendant had actual knowledge is limited to this Claim and is not intended to alter or amend any allegation contained in any other part of this complaint.

168.    Each Defendant other than the Trustee is liable for the acts of the other Defendants as a co-fiduciary.  Upon information and belief, each defendant other than the Trustee (a) knowingly participated in, or knowingly undertook to conceal, the breaches of the other fiduciaries, (b) by virtue of his own breach of fiduciary duty, enabled the other Defendants to breach their fiduciary duties, and/or (c) had knowledge of other Defendants' breaches and failed to take reasonable steps to remedy them.

169.    Upon information and belief, Defendants knew that ProQuest's negligent misstatements and nondisclosures would artificially inflate the market price of ProQuest securities

38

and that the price the Plan paid for ProQuest shares would likewise be inflated.  Upon information and belief Defendants knew that as a result of these negligent misrepresentations and nondisclosures, the Plan's purchases of ProQuest stock were imprudent because the shares cost more than their true value.  Moreover, upon information and belief, Defendants knew that when the market learned this undisclosed information, the market price of ProQuest securities – and the value of the Plan – would drop, which further caused investment in ProQuest stock to be imprudent.

170.    Defendants are liable as co-fiduciaries for the other Defendants' breaches of fiduciary duties because the Defendants:  (i) knowingly participated in, or knowingly undertook to conceal, the breaches of the other fiduciaries, (ii) by virtue of their own breaches of fiduciary duties, enabled the other Defendants to breach their fiduciary duties, and (iii) had knowledge of the other Defendants' breaches and failed to take reasonable steps to remedy them as follows:

(a)    The Director Defendants enabled the other Defendants to breach their fiduciary duties of truthful disclosure by virtue of their own breaches of their fiduciary duty to monitor the fiduciaries they appointed.

(b)    ProQuest enabled the other Defendants to breach their duties of truthful disclosure by failing to exercise its power and fulfill its duties as a plan fiduciary to take reasonable actions to prevent the other Defendants from breaching their specific duties.  As a co-fiduciary and an Administrator of the Plan, ProQuest failed to make proper inquiries regarding the Plan's disclosures, management and investment in ProQuest stock and remained inactive while other fiduciaries breached their duties of truthful disclosure.

(c)    ProQuest as a corporate entity, possessed actual knowledge of the other defendant's fiduciary breaches because the knowledge and actions of other Defendants – as corporate agents, officers, directors and employees of ProQuest – are attributable to ProQuest.

Although ProQuest had actual knowledge of the fiduciary breaches set forth in this Complaint, it failed to take reasonable steps to remedy those breaches.

171.    The Individual Defendants, and its members participated in and/or enabled the breaches of fiduciary duty by the Defendants other than the Trustee, and/or, upon information and belief, had knowledge of the other Defendants', other than the Trustee's, breaches and failed to take reasonable steps to remedy them. The Individual Defendants, authorized or signed ProQuest's SEC filings which contained material misrepresentations and omissions.

172.    As a consequence of the Defendants' breaches, the Plan suffered losses.

173.    The Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

## COUNT VIII

### Prohibited Transactions
### In Violation Of ERISA § 406

174.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

175.    By virtue of all the facts and events alleged herein, Defendants, in connection with their actions and omissions in authorizing and causing the Plan to continue to offer and require ProQuest securities as an investment during the Class Period and permitting and requiring Plaintiff and members of the Class to invest in ProQuest securities at a time when Defendants reasonably should have known about the significant risk to ProQuest – material facts that were undisclosed or misrepresented to Plaintiff and the Class – and that as a result, the prices per share at which the Plan was acquiring ProQuest securities grossly exceeded fair market value, caused the Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

176.    Because the price Defendants caused the Plans to pay for such securities was materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

177.    ProQuest is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

178.    During the Class Period, ProQuest securities were artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plan to pay an artificially inflated price for ProQuest securities.

179.    During the Class Period, the Plan invested, upon information and belief, millions of dollars in both participant and company-matching contributions in ProQuest securities, at artificially

41

inflated prices. The Plan and its participants thus over-paid for their "participation interests" in the Plan.

180. Because the Plan's acquisition of ProQuest securities at artificially inflated prices were prohibited transactions, a per se violation of ERISA § 406(a), 29 U.S.C. §1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff seeks on behalf of himself and the members of the Class to rescind all transactions purchasing or acquiring ProQuest securities.

181. Further, to restore the Plan and its participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount that the contributions used to purchase ProQuest securities for the Plan would have earned had such amounts been invested in suitable investment options.

## COUNT IX

### Breach Of Fiduciary Duty Of Loyalty To Avoid Conflicts
### Of Interest ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)

182.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

183.    At all relevant times, ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), required Defendants to act solely in the interests of the Plan Participants, including Plaintiff, and for the exclusive purpose of providing benefits to the Plan Participants.

184.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single minded devotion to the interests of the Plan and its Participants, regardless of the interests of the fiduciaries themselves or the plan sponsor.

185.    Defendants breached their duty of loyalty.

186.    Defendants had significant personal investments in ProQuest stock.

187.    During the Class Period, Defendant Roemer, sold millions of dollars worth of his individual holdings of ProQuest stock.

188.    Thus, Defendants had a significant personal financial incentive to maintain a high price for ProQuest stock.

189.    Defendants, thus, had an incentive not to disclose negative financial results to the Plan Participants in hopes that such Participants would select ProQuest stock for their retirement portfolios and therefore help maintain a high price for ProQuest stock.

190.    Defendants also had an incentive to maintain ProQuest stock as an investment option under the Plan.  If Company stock were eliminated as an investment option under the Plan, this would have sent a negative signal to Wall Street analysts, which in turn would result in reduced

43

demand for ProQuest stock and a drop in the stock price. Since the compensation of Defendants included ProQuest stock, this sequence of events would reduce their compensation.

191.    As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest in maintaining an artificially high price for ProQuest stock and the interests of the Plan Participants to avoid having their retirement portfolios invested in ProQuest stock when it was imprudent to do so and in receiving accurate information concerning ProQuest upon which to base their investment decisions.

192.    Defendants also breached their fiduciary duty of loyalty because they endorsed unreasonable growth estimates for ProQuest. Such endorsement was in the interests of Defendants to maintain an artificially high price for ProQuest stock, but was detrimental to the interests of the Plan Participants who were holding and continuing to invest in ProQuest stock based upon misinformation.

193.    Defendants also breached their fiduciary duty of loyalty because they did not timely disclose negative financial information described above. Such non-disclosure aided the interests of the Defendants in maintaining an artificially high price for ProQuest stock, but ran against the interests of the Plan Participants who were holding and continuing to invest in ProQuest stock based upon misinformation.

194.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants lost a significant portion of its retirement investments.

195.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches

of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

196.    The Plan suffered a loss, and Plaintiff and the members of the Class suffered losses, because substantial assets in the Plan were invested in ProQuest securities during the Class Period as a direct or proximate result of Defendants' breaches of the fiduciary duties they owed to Plaintiff and members of the Class.

197.    As to contributions invested in the ProQuest securities, Defendants were responsible for the prudence of investments offered under the Plan unless participants in the Plan, themselves, effectively exercised informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated thereunder.

198.    Defendants did not comply with those provisions. Rather than taking the necessary steps to ensure effective participant control by complete and accurate disclosure of material information, Defendants did the opposite. As a consequence, participants in the Plan did not have informed control over the assets of the Plan that were invested in ProQuest securities and Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

C.      Declaring that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.      Compelling Defendants to reimburse Plaintiff, the Class and the Plan for all losses resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits Defendants made through the use of the assets of the Plan, and to restore to the Plan all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.      Imposing a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of any Defendant's breach of fiduciary duty;

F.      Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

G.      Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the individual accounts of Plaintiff and the members of the Class in proportion to the losses of those accounts;

H.      Awarding Plaintiff and the members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

I.      Awarding Plaintiff and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

J.        Awarding Plaintiff and the other members of the Class such other and further relief as

the Court may deem just and proper.

STEPHEN F. WASINGER PLC

Stephen F. Wasinger (P-25963)
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, Michigan 48073
Tel.: (248) 554-6306
Fax: (248) 479-0391

SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr.
Maria J. Ciccia
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

GAINEY & MCKENNA
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

Counsel for Plaintiff

Dated: May 22, 2006
KH085664

47

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: **WAYNE**

The ... civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required ... except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required ... of the Clerk of Court for the purpose of initiating the civil docket sheet.

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| NICOLE L. VERMEYLEN, | PROQUEST COMPANY, ALAN W. ALDWORTH, KEVIN G. GREGORY, TODD W. BUCHARDT, RANDY BEST, DAVID G. BROWN, MICHAEL GELTZEILER, TODD |

(b) County of Residence of First Listed *Jackson* ~~Non-Resident~~ 2075

County of Residence of First Listed **WASHTENAW**

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(C) Attorney's (Firm Name, Address, and Telephone Number)

Stephen F. Wasinger (P-25963) Stephen F. Wasinger PLC
32121 Woodward, Suite 300
Royal Oak, MI 48073
(248) 554-6306

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

Case: 2:06-cv-12327
Assigned To: Hood, Denise Page
Referral Judge: Majzoub, Mona K
Filed: 05-23-2006 At 12:05 PM
CMP VERMEYLEN V. PROQUEST CO, ET AL (TAM)

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE / PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 881 | 28 USC 157 | ☐ 450 Commerce/ICC |
| ☐ 150 Recovery of | ☐ 320 Assault Libel | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| Overpayment and Enforcement of Judgment | And Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced & Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt. | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | Injury | | Relations | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | or Defendant) | Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor | | Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Litigation | ☐ 871 IRS–Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☒ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 (specify) Transferred from another district
- ☐ 6 Multi district Litigation
- ☐ 7 Appeal to District Judge from Magistrate

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

ERISA suit for breaches of fiduciary duty pursuant to ERISA Section 502, 29 U.S.C. Section 1132

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$DEMAND more than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY:

(See Instructions):

JUDGE Cohn (see notes)

DOCKET NUMBER 06-0619-AC

DATE
May 22, 2006

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

ANT TO LOCAL RULE 83.11

Is this a case that has been previously dismissed?  ☐ Yes
☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously   ☒ Yes
discontinued or dismissed companion cases in this or any other  ☐ No
court, including state court? (Companion cases are matters in which
it appears substantially similar evidence will be offered or the same
or related parties are present and the cases arise out of the same
transaction or occurrence.)

If yes, give the following information:  SEE BELOW

Court: _____

Case No.: _____

Judge: _____

Notes :

This case arises under ERISA.  The case pending before Judge Cohn, In Re: ProQuest Company Securities
Litigation, arises under the federal securities law.  There are, however, related parties and  substantially similar
evidence will likely be offered to prove both the ERISA and securities law claims.